UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NEAL PAPIN,

        Plaintiff,                                Case No. 17-13999

v                                                  Honorable Thomas L. Ludington

COUNTY OF BAY,

        Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On December 12, 2017, Plaintiff Neal Papin filed a complaint against Defendant County of Bay ("County"). ECF No. 1. Plaintiff claims that Defendant retaliated against him for exercising his free speech rights, discriminated against him due to his political affiliation, and violated the Michigan Whistleblowers' Protection Act. *Id.* On September 7, 2018, Defendant filed a motion for summary judgment. ECF No. 9. For the following reasons, the motion will be granted.

**I.**

Papin's claim arises from the 2012 and 2016 Bay County Sheriff elections and the candidate Robert Lee. In 2012, Lee retired from the Bay County Sheriff's Department after a 25-year career. ECF No. 1 at 2; *Lee v. Miller*, 4:15-cv-14255, ECF No. 47 at 11. That same year, he ran against John Miller for County sheriff and lost. ECF No. 1 at 2–3. In 2016, Lee again ran for sheriff and Papin served as his campaign manager. ECF No. 9-5 at 209. However, Lee lost the election to Troy Cunningham. ECF No. 1 at 7.

In 1996, Papin had started working for the County full-time as a cleaning custodian at the Law Enforcement Center. ECF No. 9-5 at 57–58. In August 2013 while cleaning, Papin saw Art Kleinert, a Bay County Sheriff's Department deputy assigned to the Bay Area Narcotics

Enforcement Team ("BAYANET").[1] *Id.* at 112–113. Papin alleges that Kleinert brought "a bag of trash into the building and dump[ed] the contents out in a room next to the squad room." ECF No. 1 at 4. Papin asked him what he was doing and Kleinert responded, "I gotta do a trash pull." *Id.* at 111. Kleinert did not say whose trash he was searching, but Papin had previously observed other BAYANET officers searching trash at the Law Enforcement Center. *Id.* at 114, 118–119.

Papin later related this experience to Lee and Lee responded that he had been missing trash. *Id.* at 113. Lee thought that Kleinert may have been searching his trash and asked Papin to inform him if Papin saw it happen again. *Id.* at 113–114. About a month later, Papin saw Kleinert searching through trash again. *Id.* at 119. He called Lee and again informed him of what he had seen. *Id.*

In July 2017, Lee was pursuing a lawsuit against the County Sheriff and others for conspiring against him during the 2016 sheriff election. *Id.* at 177; ECF No. 9-7 at 5. At the request of Lee's attorney, Papin gave Lee a statement describing what he had seen Kleinert doing. It stated in relevant part:

> I told Bob…of how I saw some weird stuff go on too, with the city/county, or other incidents in the jail, and then I came across a story of how I saw deputy Art Klenhart bring a bag of trash into the building and dump it in the room next to the squad room on the county end. Bob joked and said oh that's just a trash pull. That happens a lot. Bob had asked why Art, and I told him that Art was working Baynet now and that he was undercover…Bob kind of looked at me with a confused look and asked me if I could remember the day or date and I couldn't. My reply back was why?
>
> Bob mentioned to me that people had been going through his trash recently and he wondered if he was being targeted for something. I looked at him and he was serious. I thought the same thing since of where he use [sic] to work or maybe of the recent election outcome…He asked me if I wouldn't mind calling him the next time I saw this happen. I said sure no problem. I also told Bob of the conversation with Jeff Sargenson on the home that Miller had bought in Florida, and of how the sheriff was retiring. I told him the sheriff was still off work and that Mike Janaskee

---

[1] The spelling of this deputy's last name is unclear because Papin has used three different spellings. His complaint uses "Kleinert," his statement to Mr. Lee uses "Klenhart," and his response brief uses "Kleinart." ECF Nos. 1, 9-6, 12.

had retired. He told me of knowing of Mike Janaskee's retirement but didn't know of the home in Florida story. He was curious and bitter knowing that Miller only ran to make sure someone else would take over other than someone who won the job in an election. He noted to me that Troy wouldn't automatically takeover since that move had to be made by the Prosecutor, the County Clerk, and the Probate Judge. He said they would have to the final say of who was to be the next sheriff.

**About a month passed.**

It was 12:45 when I got a page to contact the squad room and I again walked to the room rather than call the number. I walked to the room and again I saw deputy Art Kelnhart [sic] going through another trash bag. He had dumped it on the floor just off the squad room like before and he asked me for another trash bag…I asked him what he was looking for and he said just evidence…

I wished him a good night and proceeded to put my stuff away since it was now 1 am. The voice rang in my head to call Bob since I had saw [sic] this happen again, so as I exited the building from work I called Bob on my cell phone. I apologized for the late call but Bob said it wasn't a problem, since he was up and awake watching a TV show. I told him that the trash thing had happened again and that it was in progress. Bob thanked me for the call and said he was heading out to check his trash can. He called me the next afternoon and said his trash was messed with again and that a bag was missing. He was angry and joked that he's putting some dog shit in his trash next week. He thanked me for the call and told me to not discuss this with anyone.

ECF No. 9-6 (bold language present in original). Lee sent Papin's statement to his attorney who included it in some manner in Lee's lawsuit against the County Sheriff. ECF No. 9-5 at 173.

On Friday, September 8, 2017, Shawna Walraven and Amber Davis-Johnson in the County's corporate counsel office saw Papin's statement on the website Public Access to Court Electronic Records ("PACER"). ECF No. 9-7 at 5. Upon seeing the statement, Walraven was concerned because the statement indicated that Papin had disclosed sensitive information about a potential criminal investigation to Lee, the possible target of the investigation. In Walraven's deposition, she spoke on this point.

Q: Why were you concerned about Mr. Lee asking Mr. Papin to notify him if another trash bag was pulled?

A: Because Mr. Lee thought he was the subject of the law enforcement investigation, and so, if Mr. Papin was disclosing things happening in an active investigation to the person he thought was the subject of the investigation I was concerned that could be criminal. If not criminal, I was concerned that he was

actively trying to sabotage the County. And if he wasn't actively trying to sabotage the County, that he was unable to discern what was confidential and not.

ECF No. 9-7 at 7–8. She went on to state, "My concern was not really about the content of that investigation. It was more if Mr. Papin and Mr. Lee thought that it was during an active investigation it was their belief that concerned me more than the actual investigation." *Id.* at 11.

After reviewing the statement, Walraven and Davis-Johnson discussed the affidavit with Cristen Gignac, the County director of recreation and facilities. *Id.* at 7; ECF No. 9-4 at 6. Walraven recalls discussing the following with Gignac:

> Those exact concerns, that it could be criminal. If not criminal, you know, is Mr. Papin able to discern what is confidential and what is not confidential. And the biggest concern is that he was then working at the Health Department, and so, if he was unable to determine what was confidential he would have access to protected health information in the Health Department, which is a 50,000-dollar fine for each violation of HIPAA. So, were we going to be exposed to any potential liability there.

ECF No. 9-7 at 9. Gignac had similar concerns "about [Papin's] ability to decide what information was confidential and what wasn't, and I wanted to give us time to figure that out." ECF No. 9-4 at 24.

On Monday, September 11, 2017, Cristen Gignac requested to meet with Papin. ECF 9-5 at 177–178. Thirty minutes before the meeting, Papin met with his union representative, Lisa Neil, who accompanied him to the meeting. *Id.* at 179. At the meeting, Gignac asked Papin if he had provided a signed statement for Lee's lawsuit. *Id.* at 180. He confirmed that he had. *Id.* Gignac explained that based on the letter's contents, Papin had violated various County rules. *Id.* She immediately placed him on paid administrative leave until September 18, 2017 and explained that the County would inform him of their findings no later than September 15, 2017. *Id.* She told him that while on administrative leave, he was prohibited from entering County property and then she

asked for his keys and work badge. *Id.* She stressed that the paid administrative leave was not a disciplinary action. ECF No. 9-4 at 17.

Papin received a letter dated that same day informing him that the County was placing him on paid administrative leave until Monday, September 18, 2017. It stated in relevant part:

> On the afternoon of Friday September 8, 2017, information was brought to the attention of Bay County that may indicate a violation of several work rules. Additional time is necessary to evaluate this information and to determine what, if any, disciplinary action will be taken. Due to the severity of potential violations, effective Monday, September 11, 2017, you are being placed on paid administrative leave to allow sufficient time to evaluate the information. You are being placed on leave until Monday September 18th, 2017. The results of the evaluation and further instructions will be sent to you no later than Friday September 15, 2017.
>
> During the time you are on leave, you are not to enter County property unless expressly authorized to do so by myself, the Personnel Director or the County Executive. You are to turn in your keys and swipe card to all County properties during the duration of your leave.
>
> Should you have any questions or concerns, please feel free to contact me at 989-895-4132.

ECF No. 9-3.

The possibility of facing disciplinary action made Papin anxious. *Id.* at 189. He spoke with his union president, Wanda Behmlander, the president of the United Steel Workers Local. ECF No. 9-10 at 8. He was insistent on trying to determine whether he should resign. *Id.* at 24. Behmlander told Papin that they needed to meet with the County before making a decision about what he should do. ECF No. 9-10 at 8. She did not know which County rules Papin had violated and thus could not form an opinion about what type of discipline Papin would potentially receive. ECF No. 9-10 at 19. In his complaint, Papin alleges that Behmlander told him "that his job was at risk, it appeared Defendant was going to terminate his employment, and suggested Plaintiff resign in lieu of termination." ECF No. 1. At 9–10. During her deposition, Behmlander testified that this allegation by Papin was "absolutely false" and that she had never communicated that to Papin. ECF No. 9-10 at 21–22.

Papin believed that he would receive news of the investigation prior to September 15, 2017, even though the initial letter placing Papin on administrative leave informed him that he would receive the results "no later than Friday, September 15, 2017." ECF No. 9-3; ECF No. 9-5 at 194. On September 14, 2017, Papin did not receive a letter in the mail from the County informing him of its findings. That same day, he contacted Gignac and Tiffany Jerry, the County's Personnel Director, and asked to meet with them. ECF No. 9-5 at 195. During the meeting, Jerry explained that the findings from their investigation were not yet final. *Id.* Gignac and Jerry stressed that Papin did not have to resign. ECF No. 9-8 at 20. The County had not yet made a determination from their investigation. *Id.* Regardless, Papin said that he wanted to be done with it all and resigned from his job. *Id.*; ECF No. 9-5 at 197. His letter of resignation read:

> I Neal Papin respectfully have decided to resign my post with Bay County, this September 14th 2017. It's with great regret that I do this because my time with Bay County has been wonderful. I wish everyone there the best, and I thank you so much for the experiences shared. God Bless and best wishes.

ECF No. 9-2.

**II.**

Defendant now moves for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and

determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

The first count of Papin's complaint claims that the County violated Papin's First Amendment rights because the County, as a public employer, retaliated against Papin after he engaged in protected speech. ECF No. 1 at 12–15. Papin alleges that the County constructively discharged him because Papin provided a statement to Mr. Lee's attorney as part of a lawsuit against the County.

To establish a First Amendment Retaliation claim, a plaintiff must prove that: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by his protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). If the plaintiff proves these prima facie elements, the burden then shifts to the defendant employer to prove "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir. 2000).

### A.

The First Amendment rights of a public employee, such as Papin, require "a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 88 S. Ct. 1731, 1734–1735 (1995). To determine this, two questions must be addressed. *Garcetti v. Ceballos*, 126

S. Ct. 1951, 1958 (2006). The first is "whether the employee spoke as a citizen on a matter of public concern." *Id.* If so, the second question is whether the "relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.*

**1.**

The first question has two components: whether the employee spoke as a citizen and whether the language was on a matter of public concern. *Boulton v. Swanson*, 795 F.3d 526, 531–532 (6th Cir. 2015). Whether an employee spoke as a citizen depends on whether "the speech at issue is itself ordinarily within the scope of an employee's duties…" *Lane v. Franks*, 134 S.Ct. 2369, 2379 (2014). Papin's statement concerned matters that he observed while completing his employment duties because he was cleaning the Law Enforcement Center when he saw Kleinert searching through garbage. However, making a statement to an attorney does not fall within the responsibilities of a custodian. Thus, he was speaking as a citizen when he submitted his statement to Lee's attorney.

The second component is whether the statement was on a matter of public concern. This is difficult to determine because "the boundaries of the public concern test are not well defined." *San Diego v. Roe*, 125 S. Ct. 521, 525 (2004). Adding to the challenge of this inquiry is that "it is hard to see how any aspect of the operation of any department of any public body could be said not to constitute a legitimate subject of public concern." *Brown v. City of Trenton,* 867 F.2d 318, 321–322 (6th Cir. 1989). The Supreme Court has held that language addresses a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 131 S. Ct. 1207, 1216

(2011) (citation omitted). The "content, form, and context" of the speech must be considered in making this determination. *Connick v. Myers*, 103 S. Ct. 1684, 1684 (1983).

In his complaint, Papin argues that his statement "addressed issues of potential government corruption and violation of an individual's civil rights." ECF No. 1 at 13. In his response, he expands on this by explaining that his statement "addresse[d] the possibility that a Bay County law enforcement officer was gathering and sifting through a candidate for Sheriff's trash." ECF No. 11 at 15.

Papin's statement to Lee's attorney addressed a matter of public concern. A law enforcement officer searching through the garbage of an individual running for sheriff involves the election process, a political matter within the community. Furthermore, Papin made his statement as part of Lee's lawsuit against the County Sheriff and others alleging that the County Sheriff engaged in a conspiracy to infringe Lee's rights to seek public office and to exercise free speech. *Lee v. Miller*, 4:15-cv-14255, ECF No. 1. It involved a matter of public concern because it centered on the actions of the sheriff and others in relation to the election for sheriff.

The County notes that the court in *Lee v. Miller* later dismissed the complaint at the summary judgment phase because it lacked sufficient evidence. *Id.* at ECF No. 56. The court also sanctioned plaintiff's counsel because the claims were "not supported by existing law or were not supported by the facts in the record." *Id.* at ECF No. 58 at 3. However, at the time Papin made his statement, the court had not determined that the complaint was without merit. The lawsuit involved an allegation of election misconduct when Papin made his statement and thus, addressed a matter of public concern.

**2.**

Though Papin had been speaking as a citizen on a matter of public concern, the County had an adequate justification for treating him differently than they would a member of the general public. *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1958 (2006). Factors to consider in this determination include whether the employee's "comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994). An employer is not required to "tolerate action which [it] reasonably believe[s] would disrupt the office, undermine [its] authority, and destroy close working relationships." *Connick v. Myers*, 103 S. Ct. 1684, 1694 (1983); *Gillis v. Miller*, 845 F.3d 677, 688 (6th Cir. 2017) (finding that an employer's interest in maintaining a confidential investigation outweighed plaintiff's protected speech).

As explained by Walraven, the County was concerned that as a custodian, Papin had regular access to sensitive County information that he was a party to publicly disclosing without the approval of his employer. The County had a legitimate concern about Papin's trustworthiness. Since Papin's position gave him ready access to such information, the County had sufficient justification to treat Papin differently than a member of the general public. The County had a responsibility to safeguard the information in its possession, which included ensuring that its employees handled the information properly. Even though Papin had spoken on a matter of public concern, the County was justified in placing him on paid leave while it investigated his behavior.

**B.**

Even if Papin had fulfilled both components of the first requirement, he has not fulfilled the second requirement of an adverse employment action. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). Papin claims that the County placing him on paid

administrative leave was an adverse employment action that amounted to a constructive discharge. ECF No. 1 at 14. To prove that an employer has constructively discharged an individual, the plaintiff must show that "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit." *Hurtt v. Int'l Services, Inc.*, 627 Fed. Appx. 414, 420 (6th Cir. 2015).

The facts do no support Papin's assertion that he was constructively discharged. Multiple individuals advised Papin not to resign, including his own union representative and representatives of the County. His union representative, Wanda Behmlander, advised him multiple times that they could not make a decision until the County had completed its investigation. No. 9-10 at 8. Rather, she counseled him that they needed to wait until the County completed its investigation. *Id.*

The County acted reasonably by placing Papin on paid administrative leave during its investigation. Papin has raised no other complaints concerning the rest of his experience working for the County. Accordingly, he was not constructively discharged from his employment.

## C.

Even if Papin had fulfilled the first or second prima facie requirements of his First Amendment retaliation claim, he has not established a causal connection between his alleged protected speech and the County's alleged adverse employment action. The County has made clear through multiple statements and evidence that it did not place him on paid administrative leave because of the content of his statement used in Lee's case, but rather, because the statement revealed that he had disclosed potentially sensitive County information. "[Q]uite apart from *Pickering* balancing, wrongdoing that an employee admits to…may be a valid basis for termination or other discipline." *Lane v. Franks*, 134 S. Ct. 2369 2381 n. 5 (2014). Placing Papin on temporary

paid administrative leave was in response to Papin's own conduct, not in response to the content of his statement in Lee's lawsuit.

**IV.**

In the second count of his complaint, Papin claims that the County retaliated against him in violation of his First Amendment rights because of his political affiliation. ECF No. 16–19. He asserts that the County placed him on paid administrative leave because he previously supported Lee when Lee was running as a candidate for sheriff. *Id.*

Claims of political affiliation retaliation are analyzed under the same burden-shifting framework as free speech retaliation claims. *See Dye v. Office of the Racing Commission*, 702 F.3d 286, 294 (2012). The plaintiff must show that "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Id.* (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)).

Papin has not presented sufficient evidence to establish that he engaged in constitutionally protected speech or conduct. The only paragraph alleging facts associated with the claim is paragraph 110 in which Papin alleges that "Plaintiff engaged in constitutionally protected activity by virtue of his political affiliation and past support for the [sic] Robert Lee for Sheriff campaign and his actual or perceived being against Sheriff Miller and Sheriff Cunningham." ECF No. 1 at 17. In his response, Papin further argues that, "the partisan divide between the Miller/Cunningham camp and the Lee camp continued past the 2016 election." ECF No. 11 at 21–22. He does not present any further factual support besides a general reference to "a long history of events"

between Papin and the County that culminated in his administrative leave. *Id.* These broad references to Papin's past political support for Lee are insufficient to establish that he engaged in protected speech or conduct at the time of the County's alleged adverse action.

Furthermore, he cannot fulfill the second requirement because as established above, the County placing Papin on paid administrative leave does not constitute an adverse employment action. Papin does not identify any other action by the County to support his assertion that it was retaliating against him for his political affiliation with Lee. As established above, the County has demonstrated that it placed Papin on paid administrative leave in order to investigate the extent of Papin's potential disclosure of sensitive information and not because of his exercise of his right of constitutionally protected speech or conduct.

Papin's claim of First Amendment retaliation for political affiliation will be dismissed.

## V.

The third count of Papin's complaint alleges that the County violated Michigan's Whistleblowers' Protection Act. It provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

M.C.L. 15.362.

To establish a prima facie case under the Whistleblowers' Act, the plaintiff must prove that "(1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected

activity and the discharge or adverse employment action." *West v. Gen. Motors Corp.*, 469 Mich. 177, 183–184 (2003).

Papin cannot establish all the prima facie elements because as explained above, the County did not discharge Papin or discriminate against him. Thus, Papin's complaint under Michigan's Whistleblowers' Protection Act will be dismissed.

## VI.

Accordingly, it is hereby **ORDERED** that Defendant's motion for summary judgment, ECF No. 9, is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED**.


Dated: December 11, 2018                                    s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge